IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 37 MAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of Chester |
| | : | County Court of Common Pleas, |
| | : | Criminal Division, dated July 10, |
| v. | : | 2018 at No. CP-15-CR-1570-2016. |
| | : | |
| | : | ARGUED: November 20, 2019 |
| GEORGE J. TORSILIERI, | : | |
| | : | |
| Appellee | : | |

**OPINION**

**JUSTICE BAER**                                                                    **DECIDED:  June 16, 2020**

The Chester County Court of Common Pleas declared Subchapter H of the Sex Offender Registration and Notification Act ("SORNA"), 42 Pa.C.S. § 9799.10-9799.42, unconstitutional as violative of several provisions of both the United States and Pennsylvania Constitutions.  Accordingly, this Court has exclusive jurisdiction over this appeal pursuant to 42 Pa.C.S. § 722(7) (providing the Supreme Court with exclusive jurisdiction over "[m]atters where the court of common pleas has held [statutes] invalid as repugnant to the Constitution . . . of the United States, or to the Constitution of this Commonwealth").  After review, we vacate that portion of the trial court's order declaring Subchapter H unconstitutional and remand for further development of the record.

**I. Procedural History**

The procedural history of this case is inextricably tied to intervening appellate court decisions declaring aspects of prior versions of SORNA unconstitutional and the

legislative responses to those decisions, which we will address at the outset. On July 3, 2017, a jury convicted George Torsilieri ("Appellee") of one count each of aggravated indecent assault, 18 Pa.C.S. § 3125(a)(1), and indecent assault, 18 Pa.C.S. § 3126(a)(1), but acquitted him of sexual assault, 18 Pa.C.S. § 3124.1.[1] The trial court deferred sentencing until completion of a presentence investigative report and a sexually violent predator assessment by the Sexual Offenders Assessment Board ("SOAB").

While sentencing was pending, this Court decided *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017) (plurality), holding, as discussed in detail *infra*, that the registration and notification provisions of the then-applicable SORNA were punitive. A majority of this Court consequently concluded that the punitive provisions violated the constitutional protections of Pennsylvania's *ex post facto* clause when applied retroactively to sexual offenders who were convicted prior to December 20, 2012, the effective date of SORNA.

In September 2017, the SOAB concluded that Appellee did not meet the criteria for designation as a sexually violent predator ("SVP"). Between the SOAB's determination and Appellee's sentencing, the Superior Court declared a different aspect of SORNA unconstitutional. In *Commonwealth v. Butler*, 173 A.3d 1212 (Pa. Super. 2017) ("*Butler I*"), the Superior Court concluded that, based upon this Court's analysis in *Muniz*, the designation of an offender as an SVP required proof of the relevant facts beyond a reasonable doubt under *Alleyne v. United States,* 570 U.S. 99 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).[2]

---

[1] The facts of the crime are unrelated to the legal questions before this Court challenging the registration and notification provisions of Subchapter H of SORNA.

[2] This Court recently rejected the Superior Court's analysis in *Butler I*, holding instead that the registration, notification, and counseling requirements applicable to SVPs did "not constitute criminal punishment" and therefore that the SVP designation procedure was "constitutionally permissible*." Commonwealth v. Butler*, 226 A.3d 972, 976 (Pa. 2020)

Subsequently, the trial court sentenced Appellee in November 2017 to an aggregate incarceration term of one year minus one day to two years minus one day, followed by three years of probation, plus payment of a fine and costs. The court originally provided that Appellee would be eligible for work release after eighteen months and parole after twenty-two months. Additionally, as explained *infra*, Appellee's aggravated indecent assault conviction automatically categorized him as a Tier III offender, triggering lifetime sexual offender registration pursuant to all applicable versions of SORNA. 42 Pa.C.S. § 9799.14 (d)(7).

In December 2017, Appellee filed a combined post-sentence motion raising a weight of the evidence claim and a motion to reconsider the sentence, and the court held a hearing. On February 8, 2018, without reconvening the parties, the court granted Appellee's motion in part and denied it in part, altering the sentence only to allow work release after fourteen months, rather than eighteen months, and parole after eighteen months, rather than twenty-two months. On February 16, 2018, the Commonwealth filed a motion for reconsideration, asserting that the trial court erred in resentencing Appellee without reconvening the parties.

While the motion for reconsideration was pending, Act 10 of 2018, Act of Feb. 21, 2018, P.L. 27, No. 10, became effective on February 21, 2018 ("Act 10"). As detailed *infra*, Act 10 responded to this Court's decision in *Muniz* and the Superior Court's decision in *Butler I*, declaring aspects of the prior version of SORNA unconstitutional. In relevant

---

("*Butler II*"). As *Butler II* involves provisions related to the SVP designation process, it is not relevant to Appellee, who was not designated an SVP.

part, the amendments included a revised version of Subchapter H, which applies to Appellee who was convicted after the original enactment of SORNA.[3]

Soon thereafter, Appellee challenged the constitutionality of the newly amended Subchapter H by filing a Post Sentence Motion Nunc Pro Tunc and a Supplemental Post Sentence Motion Filed Nunc Pro Tunc. Appellee claimed that the registration and notification provisions of Subchapter H violated his due process rights under the Pennsylvania Constitution. The trial court granted Appellee the right to file his motions *nunc pro tunc* in March 2018.

Prior to a hearing on the pending motions, Appellee filed a subsequent motion on May 18, 2018, entitled "Post Sentence Motion to Bar Application of SORNA, Act 10 of 2018, 42 Pa.C.S. § 9799.10-9799.42 Chapter 97, Subchapter H of Title 42; and/or Motion for Habeas Corpus and/or Bar Imposition of an Illegal Sentence," asserting eight reasons that the application of the newly enacted registration and notification provisions were unconstitutional, which will be discussed in detail below. Many of the assertions turn on the validity of the presumption in SORNA that all sexual offenders are dangerous and pose a high risk of recidivation, necessitating registration and notification procedures to protect the public from recidivist sexual offenders. Appellee claimed that this presumption is not supported by current research, and instead Appellee asserted that the imposition of the registration and notification provisions threaten public safety by preventing reintegration of the offenders as law-abiding citizens.

Once again, while these motions were pending in the trial court, the General Assembly enacted and the Governor signed an amended version of SORNA through Act 29 of 2018, Act of June 12, 2018, P.L. 140, No. 29, effective immediately on June 12,

---

[3] As explained *infra*, Act 10 also added Subchapter I, which applies to offenders who committed their offenses between April 22, 1996, and December 20, 2012, when SORNA became effective.

2018 ("Act 29"). The parties do not suggest that the amendments of Act 29 alter the provisions of Subchapter H relevant to the issues currently under review. It is Act 29's iteration of Subchapter H of SORNA that is currently before this Court. For ease of discussion, we will refer to the current version of SORNA challenged by Appellee as "Revised Subchapter H" and the prior version generally as "SORNA".

At the July 9, 2018 hearing on the cross-motions, the Commonwealth argued that a post-sentence motion hearing was not the appropriate proceeding for adjudicating the constitutionality of SORNA based upon scientific challenges to legislative fact-finding regarding the likelihood of recidivism and the effectiveness of registration systems.[4] It emphasized that this Court in *Muniz* recently cited to conflicting studies concerning the rate of sexual offender recidivation and specifically deferred to the legislature, as the proper policy-making body, to address the complex societal issues, in the absence of a scientific consensus. Notes of Transcript ("N.T."), July 9, 2018, at 16-17. Despite the Commonwealth's argument, the court allowed Appellee to introduce affidavits and supporting documents of three experts concluding that sexual offenders generally have low recidivism rates and questioning the effectiveness of sexual offender registration systems such as SORNA. The Commonwealth stipulated to the content of the exhibits but not their validity or relevance. Moreover, the Commonwealth did "not offer any rebuttal expert testimony nor [did it] offer any documents with respect to these witnesses."

---

[4] The Commonwealth additionally argued that a sentencing court was an inappropriate forum for reviewing the constitutionality of the provision because the statute provided that at sentencing "the court shall have no authority to relieve a sexual offender from the duty to register under this subchapter or to modify the requirements of this subchapter as they relate to the sexual offender." 42 Pa.C.S. § 9799.23(b)(2). While this language forbids a court from modifying an offender's registration requirements as set forth in the statute, we do not view this language as limiting a court's authority to consider the constitutionality of the statute.

*Id.* at 19. It additionally argued that Revised Subchapter H addressed the constitutional deficiencies identified in *Muniz* and *Butler I.*

At the conclusion of the hearing and in a subsequent order dated July 10, 2018, the trial court acknowledged that it erred in failing to re-sentence Appellee in open court and attempted to correct the issue by vacating the February 8th order and re-imposing the reduced sentence in open court, after explaining its view that Appellee did not have a prior record, was youthful, and was a good candidate for rehabilitation.

The court then turned to Appellee's constitutional challenges.[5] It concluded that the registration and notification provisions of Revised Subchapter H violated Appellee's right to due process by impairing his right to reputation, as protected by the Pennsylvania Constitution, through the utilization of an irrebuttable presumption. The court also concluded that the statute violated his right to due process under the United States and Pennsylvania Constitutions because the statutory system failed to provide the requisite notice and opportunity to be heard. It also concluded that Revised Subchapter H violated the separation of powers doctrine because the General Assembly's enactment of Revised Subchapter H essentially removed the trial court's ability to fashion an individualized sentence. Finally, the court held that the statute violated *Alleyne* and *Apprendi* by allowing "the imposition of enhanced punishment based on an irrebuttable presumption of future dangerousness that is neither determined by the finder of fact nor premised upon proof beyond a reasonable doubt." Tr. Ct. Order, July 10, 2018, at 3. The court, therefore, vacated Appellee's sentence to the extent it required him to comply with Revised Subchapter H's sexual offender registration provisions.

---

[5] Given the number and complexity of the constitutional challenges, we will set forth the trial court's reasoning on each issue as necessary *infra.*

The Commonwealth appealed to this Court in July 2018, raising thirteen claims of error and invoking this Court's jurisdiction over decisions of the Courts of Common Pleas declaring statutes unconstitutional, 42 Pa.C.S. § 722(7).[6]  Subsequently, we granted the Office of the Attorney General's application for intervention but denied intervention sought by the Pennsylvania State Police.

## II. Standard and Scope of Review

The constitutional issues before this Court raise questions of law for which our standard of review is *de novo* and our scope of review is plenary.  *Muniz*, 164 A.3d at 1195.  In addressing constitutional challenges to legislative enactments, we are ever cognizant that "the General Assembly may enact laws which impinge on constitutional rights to protect the health, safety, and welfare of society," but also that "any restriction is subject to judicial review to protect the constitutional rights of all citizens."  *In re J.B.*, 107 A.3d 1, 14 (Pa. 2014).  We emphasize that "a party challenging a statute must meet the high burden of demonstrating that the statute clearly, palpably, and plainly violates the Constitution."  *Id.* (internal quotations marks and citation omitted).

## III. History of Sexual Offender Registration in Pennsylvania

The case at bar presents the latest in a series of constitutional challenges to Pennsylvania's sexual offender registration and notification provisions spanning the last two decades.  We review these cases and the legislative responses as they are relevant to the issues now on appeal.

In 1999, this Court deemed unconstitutional a provision of what has come to be known as Megan's Law I, 42 Pa.C.S. §§ 9791-9799.6 (repealed).  *Commonwealth v.*

---

[6] Appellee additionally appealed his judgment of sentence to the Superior Court, which affirmed in an unpublished decision, 2300 EDA 2018.  Appellee filed a petition for allowance of appeal with this Court, raising issues unrelated to the Commonwealth's challenges currently under review, which was denied on April 22, 2020.  *Commonwealth v. Torsilieri*, ___ A.3d ___, 2020 WL 1933752 (Pa. April 22, 2020).

*Williams*, 733 A.2d 593 (Pa. 1999) ("*Williams I").* Under Megan's Law I, sexual offenders were presumed to be sexually violent predators and were subject to a potential maximum sentence of life imprisonment, unless the offender rebutted the presumption by clear and convincing evidence. We concluded that the statute as enacted was "constitutionally repugnant" because it placed the burden of proof on the individual rather than the Commonwealth and struck "all of the relevant provisions of the Act pertaining to sexually violent predators." *Id.* at 603, 608. The decision did not consider the effect of notification and registration requirements for those not designated SVPs.

In *Commonwealth v. Gaffney*, 733 A.2d 616 (Pa. 1999), a companion case to *Williams I*, the Court addressed the notification requirements and concluded that they were not punitive, and, therefore, did not violate the *ex post facto* protections. In so concluding, this Court utilized a test articulated by the Court of Appeals for the Third Circuit in *Artway v. Attorney General*, 81 F.3d 1235 (3d Cir. 1996), and *E.B v. Verniero*, 119 F.3d 1077 (3d Cir. 1997).[7] In discussing the merits of Gaffney's argument, this Court distinguished the provisions of Megan's Law I from the colonial era punishment of public shaming by emphasizing the limited registration and notification provisions of Megan's Law I, which only required annual verification of the offender's current address for ten years and limited distribution of that information to the local police.

In the wake of *Williams I* and *Gaffney*, the General Assembly enacted Megan's Law II, 42 Pa.C.S. §§ 9791–9799.7 (expired), in May 2000 to address the constitutionally defective aspects of Megan's Law I, relating to SVP designation. In addition, Megan's Law II also altered the registration requirements for all offenders, regardless of SVP

---

[7] The *Artway-Verniero* test provided "that a particular measure will be considered punishment where: (1) the legislature's actual purpose is punishment, (2) the objective purpose is punishment, or (3) the effect of the statute is so harsh that 'as a matter of degree' it constitutes punishment." *Gaffney*, 733 A.2d at 618.

classification, who were convicted of a predicate offense. It mandated either ten-year or lifetime registration of their addresses upon release and any subsequent change in address, which information was provided to the local chief of police. The police additionally alerted neighbors and local day care and school officials to SVPs living in the neighborhood, providing information including a photo, the address, and the offense.

In *Commonwealth v. Williams*, 832 A.2d 962, 964 (Pa. 2003) ("*Williams II*"), this Court confronted the question of "whether the statute's registration, notification, and counseling requirements, applicable to individuals deemed sexually violent predators, constitute[d] criminal punishment," which would have resulted in a violation of the United State Supreme Court's holding in *Apprendi*, requiring all factual determinations that result in increasing a defendant's punishment beyond the statutory maximum to be made by a jury and proven beyond a reasonable doubt.

In *Williams II*, this Court recognized that since its decision in *Gaffney*, the United States Supreme Court had adopted a test applicable to whether a sexual offender registration and notification statute was punitive. In *Smith v. Doe I,* 538 U.S. 84 (2003), the High Court, reviewing an *ex post facto* challenge to Alaska's version of Megan's Law, applied a test developed in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144 (1963).[8] As will be discussed in detail *infra*, this Court applied the *Mendoza-Martinez* test and concluded that the Megan's Law II registration, notification, and counseling provisions, applicable to

---

[8] In *Smith*, the United States Supreme Court reviewed the constitutionality of Alaska's Sex Offender Registration Act, which involved retroactive quarterly registration and notification provisions that resulted in the public disclosure of an offender's name, address, conviction, photograph, and various other information on the internet. Relevantly, the registration provision did not require in-person updates to the information. The Court concluded that the provisions were not punitive and therefore did not violate the federal *ex post facto* clause.

SVPs, did not violate *Apprendi*.[9] While not presented in the case, we acknowledged, in *dicta*, that the lifetime registration, notification, and counseling period was "one of the most troubling aspects of the statute." *Williams II*, 832 A.2d at 982. Referencing the seventh *Mendoza-Martinez* factor of excessiveness, we opined that "[a] reasonable argument could be made that, to avoid excessiveness, the Legislature was required to provide some means for a sexually violent predator to invoke judicial review in an effort to demonstrate that he no longer poses a substantial risk to the community." *Id.* at 982–83.[10]

In 2007, this Court addressed whether the lifetime registration, notification, and counseling provisions applicable to SVPs constituted punishment implicating various constitutional challenges. *Commonwealth v. Lee*, 935 A.2d 865 (Pa. 2007). In so doing, we reiterated that only a demonstration of the "clearest proof" can overcome a legislative assertion that a standard is civil rather than punitive. Id. at 877 (quoting *Williams II*, 832 A.2d at 973). Applying this standard, we recognized that the first six *Mendoza-Martinez* factors had been found to weigh in favor of finding the provisions non-punitive in prior cases considering Megan's Law II. *Id.* at 885. We, therefore, focused on the seventh factor: whether the procedure was excessive in comparison to the non-punitive purpose.

While we acknowledged the offenders' proffered scientific studies arguably demonstrated that the risk of recidivism diminishes with age, we nevertheless held that

---

[9] We additionally concluded in *Williams II* that the punishment for an SVP's failure to comply was unconstitutionally punitive but severable.

[10] In 2004, the General Assembly passed Act 152, a subset of which became known as Megan's Law III. This Court, however, determined that the Act as passed violated the single-subject requirement of Article III, Section 3 of the Pennsylvania Constitution, as it contained various other provisions not sufficiently related to Megan's Law. *Commonwealth v. Neiman*, 84 A.3d 603 (Pa. 2013). Concluding that the provisions could not be severed, the Court struck Act 152 in its entirety.

the studies merely constituted "a counter-narrative to the evidence that the General Assembly relied upon in gauging the necessity and formulating the provisions of Megan's Law, which also is supported by empirical evidence and numerous studies." *Id.* Accordingly, we concluded that the challengers failed to meet their burden of proving Megan's Law II unconstitutional by demonstrating that it was punitive. We emphasized that the "clearest proof" standard "cannot be satisfied merely by providing evidence militating in favor of a more generous account of the likelihood of rehabilitation than that found by the General Assembly in originally fashioning its legislation requiring registration of sex offenders." *Id.* at 886.

In 2012, the General Assembly adopted the Sex Offender Registration and Notification Act (SORNA), 42 Pa.C.S. §§ 9799.10–9799.41 ("SORNA"), which became effective on December 20, 2012, replacing Megan's Law II's provisions. A stated purpose of SORNA was "[t]o bring the Commonwealth into substantial compliance with the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 109-248, 120 Stat. 587)." 42 Pa.C.S. § 9799.10(1). The federal law mandated states' adoption of a tier-based registration and notification framework for sex offenders. States that do not enact the provisions are subject to a penalty, unless the state demonstrates that implementation of a provision "would place the jurisdiction in violation of its constitution, as determined by a ruling of the jurisdiction's highest court." 34 U.S.C. § 20927(a), (b)(1). The federal provisions explain that in such cases "the Attorney General [of the United States] may determine that the jurisdiction is in compliance with this chapter if the jurisdiction has made, or is in the process of implementing reasonable alternative procedures or accommodations, which are consistent with the purposes of this chapter." *Id.* § 20927(b)(3).

In adopting SORNA and implementing the federal requirements, the General Assembly set forth legislative findings and a declaration of policy in which it explained that "[t]he Adam Walsh Child Protection and Safety Act of 2006 provides a mechanism for the Commonwealth to increase its regulation of sexual offenders in a manner which is nonpunitive but offers an increased measure of protection to the citizens of this Commonwealth." 42 Pa.C.S. § 9799.11(a)(2). The Act continues, "If the public is provided adequate notice and information about sexual offenders, the community can develop constructive plans to prepare for the presence of sexual offenders in the community."[11] Id. § 9799.11(a)(3); see also Id. § 9799.11(a)(6), (7), (8).

In line with the federal requirements, the Act created a three-tier registration system based upon the underlying criminal offense, with Tier III applying to the most severe sexual offenses. Id. § 9799.14. The duration and frequency of the periodic

---

[11] The Act provides a similar statement in its declaration of policy, which provides in relevant part:

> (1) It is the intention of the General Assembly to substantially comply with the Adam Walsh Child Protection and Safety Act of 2006 and to further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation relates to registration of sexual offenders and community notification about sexual offenders.

> (2) It is the policy of the Commonwealth to require the exchange of relevant information about sexual offenders among public agencies and officials and to authorize the release of necessary and relevant information about sexual offenders to members of the general public as a means of assuring public protection and shall not be construed as punitive.

42 Pa.C.S. § 9799.11(b)(1), (2).

reporting requirements vary across the tiers with Tier 1 offenders required to report annually for fifteen years, Tier II offenders reporting semiannually for twenty-five years, and Tier III offenders reporting quarterly for their lifetimes.[12] *Id.* § 9799.15(a). This provision also dictates various events necessitating in-person reporting, such as a change in address, employment, telephone number, or email address. *Id.* § 9799.15(g). An offender that is required to register is subject to prosecution for failure to comply under 18 Pa.C.S. § 4915.1.

As directly relevant to the issues in the case at bar, the General Assembly additionally declared, "Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." 42 Pa.C.S. *§* 9799.11(a)(4). SORNA establishes that a state-wide registry of sexual offenders is to be maintained by the state police and dictates a substantial list of information regarding the offender to be included on the registry. *Id.* § 9799.16. The Act dictates that the State Police should develop a system that disseminates the registrants' information to the public through a website and allows the public to search that information by "any given zip code or geographic radius set by the user." *Id.* § 9799.28. It further mandates that a trial court "shall have no authority to relieve a sexual offender from the duty to register under this subchapter or to modify the requirements of this subchapter as they relate to the sexual offender." *Id.* § 9799.23(b)(2).

As with its predecessors, SORNA's enactment spurred numerous constitutional challenges to the increased registration and reporting requirements, and many of the claims are echoed in the challenges currently before this Court. In *In re J.B.*, 107 A.3d 1 (Pa. 2014), juvenile sexual offenders raised numerous constitutional challenges to

_____

[12] Sexual violent predators are also subjected to quarterly lifetime registration regardless of the tier level of the underlying crime as well as additional requirements such as counseling under Section 9799.36. *Id.* at 9799.15(a)(6), (d), (f).

SORNA's application including a claim that it violated their due process rights by utilizing an irrebuttable presumption that all juvenile offenders "pose a high risk of committing additional sexual offenses," 42 Pa.C.S. § 9799.11(a)(4). This Court recognized that to establish a violation of the doctrine, the challenging party must demonstrate (1) an interest protected by the due process clause, (2) utilization of a presumption that is not universally true, and (3) the existence of a reasonable alternative means to ascertain the presumed fact. *J.B.*, 107 A.3d at 15-16.

Applying the first element of the doctrine, this Court concluded that the juveniles in *J.B.* had asserted a protected interest in their right to reputation, which is protected as a fundamental right under the Pennsylvania Constitution but is not specifically included in the federal constitution. *Id.* at 16. We additionally opined that their right to reputation had been infringed by the statutory declaration "that sexual offenders, including juvenile offenders, 'pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest.' 42 Pa.C.S. § 9799.11(a)(4)." *Id.* This Court emphasized that juvenile offenders did not have a meaningful opportunity to challenge the presumption of recidivism and dangerousness.

This Court next considered whether the presumption of a high risk of recidivism was universally true when applied to juveniles convicted of sexual offenses. We observed that the trial court in *J.B.* had credited research which indicated that juvenile offenders had low levels of recidivism. *Id.* at 17-18. Importantly, these findings drew support from recent United States Supreme Court decisions recognizing the fundamental differences between juveniles and adults including greater impulsivity due to lack of maturity, increased vulnerability to negative influences, and malleability of character. *Id.* at 18-19 *(*discussing *Miller v. Alabama*, 567 U.S. 460 (declaring unconstitutional mandatory life imprisonment without parole for crimes committed as a juvenile); *Graham v. Florida*, 560

U.S. 48 (2010) (prohibiting imposition of life without parole for non-homicide crimes committed as a juvenile); *Roper v. Simmons*, 543 U.S. 551 (2005) (forbidding imposition of death penalty on those who commit offenses as juveniles)). We observed that the trial court opined that "these distinctions between adults and juveniles are particularly relevant in the area of sexual offenses, where many acts of delinquency involve immaturity, impulsivity, and sexual curiosity rather than hardened criminality." *Id.* at 19. Given this corroborated research, we concluded that the statutory presumption that juveniles sexual offenders were at high risk of recidivating was not universally true.

Finally, we evaluated whether reasonable alternative means existed to ascertain whether a juvenile offender was at high risk of recidivism. The Court observed that SORNA already provided for individualized assessment of adult sexual offenders as sexually violent predators and juvenile offenders as sexually violent delinquent children. We therefore concluded that a similar individualized assessment process could be used to consider whether juvenile sexual offenders posed a high risk of recidivating. Accordingly, we held that application of SORNA's lifetime registration requirements to juvenile offenders violated their due process rights by utilizing an irrebuttable presumption that they posed a high likelihood of recidivating.

Three years after deciding *J.B.*, this Court additionally found SORNA violated adult offenders' *ex post facto* rights due to its retroactive application to those convicted prior to its effective date of December 20, 2012. *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017) (plurality). The decision in *Muniz* hinged on whether the registration and notification provisions of SORNA were punitive, such that the protections of the *ex post facto* clause applied. The Court applied the *Mendoza-Martinez* test as adopted in *Williams II* but reached the opposite conclusion. The Court distinguished SORNA's requirements from those of Megan's Law II in a thorough analysis of each of the seven factors in the

*Mendoza-Martinez* test.[13]  Weighing all seven factors, the Court concluded that SORNA was punitive, such that retroactive application of the provision violated Pennsylvania's *ex post facto* clause.[14]

Months later, the Superior Court applied our decision in *Muniz sua sponte* to a constitutional challenge to SORNA's SVP designation process in *Butler I*.  It read our decision as providing that all SORNA registration requirements "are now deemed to be punitive and part of the criminal punishment imposed upon a convicted defendant." *Butler I*, 173 A.3d at 1215.  Based upon this conclusion, the Superior Court found that the SVP determination, which it viewed as punitive, hinged on a trial court's findings based only upon clear and convincing evidence.  42 Pa.C.S. § 9799.24(e)(3) (instructing that "the court shall determine whether the Commonwealth has proved by clear and convincing evidence that the individual is a sexually violent predator").  It, thus, deemed SORNA's SVP designation process unconstitutional as violative of *Apprendi* and *Alleyne*.[15]

In response to *Muniz* and *Butler I*, the General Assembly enacted Act 10, specifically declaring that "[i]t is the intention of the General Assembly to address the Pennsylvania Supreme Court's decision in *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017) and the Pennsylvania Superior Court's decision in *Commonwealth v. Butler*, [173 A.3d 1212 (Pa. Super. 2017)]." 42 Pa.C.S. § 9799.11(4).  Act 10 split SORNA, which was previously designated in the Sentencing Code as Subchapter H into two subchapters.

_____

[13] We will address in detail this Court's treatment of each of the factors in summarizing the trial court's analysis of the current iteration of Revised Subchapter H *infra*.

[14] While a majority of justices agreed that SORNA violated the state *ex post facto* clause, the Court divided as to whether the federal and state *ex post facto* clauses were coterminous and whether the Court should address the question under the federal provision.

[15] As noted, this Court subsequently reversed the Superior Court's decision in *Butler II*, 226 A.3d 972, holding the SVP designation process constitutional.

Revised Subchapter H applies to crimes committed on or after December 20, 2012, whereas Subchapter I applies to crimes committed after April 22, 1996, but before December 20, 2012. In essence, Revised Subchapter H retained many of the provisions of SORNA, while Subchapter I imposed arguably less onerous requirements on those who committed offenses prior to December 20, 2012, in an attempt to address this Court's conclusion in *Muniz* that application of the original provisions of SORNA to these offenders constituted an *ex post facto* violation.[16]

Presumably attempting to address this Court and the Superior Court's determinations that the prior registration and notification requirements were punitive, the General Assembly modified some of the SORNA provisions. Specifically, it created a process by which a Tier II or III offender's in-person semi-annual or quarterly registrations could be reduced after three years and replaced with annual in-person and semi-annual or quarterly phone registrations if the offender complies with all registration requirements for the first three years and has not been convicted of another offense punishable by more than a year of incarceration. 42 Pa.C.S. § 9799.25(a.1). It additionally limited the non-sexual offenses triggering SORNA registration.[17] Finally, it provided a process for sexual

---

[16] We recognize that challenges to the registration and notification provisions of Subchapter I are also currently pending in this Court following argument in November 2019 in *Commonwealth v. Lacombe*, 35 MAP 2018, and *Commonwealth v. Witmayer*, 64 MAP 2018. In *Lacombe* and *Witmayer*, we are reviewing a trial court's declaration of Subchapter I's provisions as punitive and thus, as an unconstitutional violation of the *ex post facto* clause, whereas, in the case at bar, we consider only Revised Subchapter H.

[17] Appellee observes that the General Assembly did not remove from the tier registration provisions all of the non-sexual offenses highlighted by this Court in *Muniz*. Specifically, the requirements still apply to those convicted of unlawful restraint, 18 Pa.C.S. § 2902(b); false imprisonment, 18 Pa.C.S. § 2903(b); or filing factual statement about alien individual, 18 U.S.C. § 2424. Appellee Brief at 12-13 (citing 42 Pa.C.S. § 9799.14(b)(1)-(3), (19)). In regard to the offense of interference with custody of a child, 18 Pa.C.S. § 2904, Appellee asserts that new Section 9799.14(b)(3) amended the provision only to

offenders to petition for removal from the registry after twenty-five years if they demonstrate the absence of any conviction for an offense punishable by more than a year of incarceration and proof by "clear and convincing evidence that exempting the sexual offender . . . is not likely to pose a threat to the safety of any other person." *Id.* § 9799.15(a.2). As noted, Act 10 was later reenacted as Act 29.

**IV. Analysis**

With this background in mind, we address the Commonwealth and the Attorney General's challenges to the trial court's holdings that Revised Subchapter H violates numerous constitutional protections. The court's conclusions will be considered in two broad categories. First, the court held that Revised Subchapter H violates Pennsylvania's due process protections through the unconstitutional use of an irrebuttable presumption. The trial court considered this holding as implicating both procedural and substantive due process protections. As this Court and others have refused to "pigeonhole" the irrebuttable presumption doctrine into either due process category, we address this claim simply as an irrebuttable presumption challenge. *Com., Dept. of Transp., Bureau of Driver Licensing v. Clayton*, 684 A.2d 1060, 1064 (Pa. 1996) (opining that "we do not believe it wise to pigeonhole whether an analysis of an irrebuttable presumption is solely one of substantive or procedural due process").

Second, the trial court held that Revised Subchapter H's registration and notification provisions are punitive in nature such that they must comply with all constitutional and statutory protections applicable to sentencing. Based on the determination of punitive effect, the trial court concluded that the registration

---

exempt "cases where the defendant is the child's parent, guardian or other lawful custodian." 42 Pa.C.S. § 9799.14(b)(3). He emphasizes that the section would still result in registration for any "other family members, like non-custodial grandparents or siblings." Appellee Brief at 13.

requirements, which can result in lifetime registration branding an offender as at high risk of recidivation, violated (1) the requirements of *Apprendi* and *Alleyne*, (2) imposed sentences in excess of the statutory maximum sentence, (3) constituted cruel and unusual punishment, and (4) violated the separation of powers doctrines by preventing trial courts from imposing individualized sentences. We recognize that several of these holdings implicate both federal and state constitutional provisions.

### A. Trial Court's Consideration of Scientific Evidence

Prior to considering the merits of these constitutional determinations, we first attend to the Commonwealth and Attorney General's overarching assertion that the trial court's holdings are based on its improper admission of and reliance upon Appellee's expert affidavits calling into question the underpinnings of Revised Subchapter H. The Commonwealth parties' arguments focus on two aspects of the trial court's analysis: (1) its refusal to defer to the legislative determination that sexual offenders as a cohort pose a danger to the public health due to their high risk of recidivation and (2) its rejection of the legislative conclusion that tier-based sexual offender registration systems, as exemplified by Revised Subchapter H, are an effective means of protecting the public from the danger posed by sexual offenders.

The Commonwealth asserts that a challenge based on evidence of recidivism rates and the effectiveness of tier-based registration systems was recently presented to and rejected by this Court in *Muniz.* In that case, we opined, "In this context, we find persuasive [the] argument that policy regarding such complex societal issues, especially when there are studies with contrary conclusions, is ordinarily a matter for the General Assembly." *Muniz*, 164 A.3d at 1217. The Commonwealth asserts that legislative findings are "entitled to a *prima facie* acceptance of their correctness." Com. Reply Brief at 2. It relies upon this Court's reasoning that "[s]uch a rule is salutary because courts

are not in a position to assemble and evaluate the necessary empirical data which forms the basis for the legislature's findings." *Id.* (quoting *Basehore v. Hampden Industrial Development Authority*, 248 A.2d 212, 217 (Pa. 1968)). The Commonwealth emphasizes this Court's repeated acknowledgment that policy determinations should be left to the legislative branch. *Id.* at 2-3 (citing, *inter alia*, *Commonwealth v. Hale*, 128 A.3d 781, 785-86 (Pa. 2015), and *Program Administration Services, Inc. v. Dauphin County General Authority*, 928 A.2d 1013, 1017- 1018 (Pa. 2007)).

The Attorney General additionally contests the merits of the evidence relied upon by the trial court, asserting that Appellee cherry-picked the studies in support of his assertions and ignored contradictory research. Despite failing to provide contrary evidence during the post-sentence motion before the trial court, the Attorney General now highlights a recent study refuting Appellee's experts' conclusions. Attorney General ("A.G.") Reply Brief at 4 (citing Drs. Nicolas Scurich and Richard John, "The Dark Figure of Sexual Recidivism," *University of California Irvine, School of Law, Legal Studies Research Paper Series No. 2019-09*, https://ssrn.com/abstract=3328831 (Feb. 4, 2019)).[18] Given this underlying dispute, the Attorney General asserts that "[c]ourts are

---

[18] Respectfully, Justice Donohue, in dissent, oversimplifies the Commonwealth's response to Appellee's experts. The Dissent correctly observes that the Attorney General contends that Appellee's experts underestimate the total number of sexual offenses, thus understating the actual recidivism rate. Dissenting Op. at 2 (Donohue, J., dissenting). The Attorney General, however, also generally challenges "many of the assumptions and conclusions" of Appellee's experts and specifically argues that the studies relied upon by Appellee's experts utilize short time frames that fail to account fully for all the recidivist acts of sexual offenders. A.G. Reply Brief at 4-7.

Similarly, while the Dissent correctly recognizes that "[t]he Commonwealth stipulated to the content but not the validity or relevance" of the Appellee's experts' affidavits, it later suggests the opposite by opining that the Commonwealth stipulated to Appellee's conclusion that the recidivism risk was "nowhere near the 'frightening and high' rate assumed by" prior cases. Dissenting Op. at 1, 5 (Donohue, J., dissenting). The Attorney

not the proper forum for scientists to debate controversies and are ill equipped to determine scientific truth." *Id.* at 8 (relying *inter alia* on *Muniz*, 164 A.3d at 1217, and *Lee*, 935 A.2d at 885). It maintains that, in the absence of scientific consensus, "legislative findings and public policy judgments of the General Assembly are not subject to judicial second-guessing." *Id.* at 7.

We acknowledge the danger of courts overriding legislative determinations for all the reasons highlighted by the Commonwealth parties. As we have repeatedly observed, "the General Assembly's ability to examine social policy issues and to balance competing considerations is superior to that of the judicial branch." *Hale*, 128 A.3d at 785–86 (citing *Lance v. Wyeth*, 85 A.3d 434, 454 & n.26 (Pa. 2014)). Indeed, as the Commonwealth parties emphasize, we recently opined on the same scientific dispute observing that "[a]lthough there are contrary scientific studies, we note there is by no means a consensus, and as such, we defer to the General Assembly's findings on this issue." *Muniz*, 164 A.3d at 1217.

Nevertheless, our deference to legislative determination is not boundless. Indeed even in the cases relied upon by the Commonwealth, the limits are clear. In *Hale*, we opined that "substantial policy considerations" "are generally reserved, in the first instance, to the General Assembly," but clarified that the policy determinations were nonetheless "subject to the limits of the Constitution." *Hale*, 128 A.3d at 785-86. Similarly, in *Program Administrative Services*, we cabined our statement that "courts should not lose sight of the respective roles of the General Assembly and the courts in terms of establishing public policy" by nevertheless emphasizing that the General Assembly policy making function was "subject to constitutional limitations." *Program Admin. Services, Inc.*,

General, presumably, would adamantly dispute this assertion as its argument emphasizes a conflict among social scientists regarding the recidivism rates of sexual offenders. A.G. Reply Brief at 4-7.

928 A.2d at 1017-18. These statements reaffirm that our underlying system of checks and balances requires the courts to serve as a backstop to protect constitutional rights of our citizens even where legislative social policy determinations are involved. *See generally In re Fortieth Statewide Investigating Grand Jury*, 197 A.3d 712, 715 (Pa. 2018) ("[A]s with all legal proceedings which affect fundamental individual rights, the judicial branch serves a critical role in guarding against unjustified diminution of due process protections for individuals whose right of reputation might be impugned.")

As described above, we recently addressed related scientific evidence which called into question the General Assembly's determination that juvenile offenders posed a significant risk of recidivism requiring registration under SORNA. In *J.B.*, we concluded that the scientific consensus relating to adolescent development, as recognized through the United States Supreme Court's jurisprudence, refuted the legislative presumption that all juvenile offenders were at high risk of recidivation. *J.B.*, 107 A.3d at 17-19. This scientific evidence, in turn, undermined the constitutionality of the application of SORNA's registration and notification procedures to juvenile offenders as it violated their right to reputation under the Pennsylvania Constitution.

Our conclusion in *J.B.*, while not controlling given its focus on juvenile development, demonstrates that a viable challenge to legislative findings and related policy determinations can be established by demonstrating a consensus of scientific evidence where the underlying legislative policy infringes constitutional rights. In such cases, it is the responsibility of the court system to protect the rights of the public. Indeed, we have a particular responsibility in regard to SORNA, given that only a decision by this Court, finding select provisions unconstitutional under the Pennsylvania's charter, can safeguard the constitutional rights of Pennsylvanians while also potentially averting the

loss of federal funding due to Pennsylvania's non-compliance with the federal Adam Walsh Act. 34 U.S.C. § 20927.

Accordingly, we respectfully reject the Commonwealth parties' categorical contention that the trial court lacked the authority to consider Appellee's scientific evidence and to question the validity of the General Assembly's findings and policy determinations in regard to the contention that Appellee's various constitutional rights were violated by the statutory provisions based upon the legislative determinations. Nevertheless, we remain mindful that "the wisdom of a public policy is one for the legislature, and the General Assembly's enactments are entitled to a strong presumption of constitutionality rebuttable only by a demonstration that they clearly, plainly, and palpably violate constitutional requirements." *Shoul v. Com., Dept. of Transp., Bureau of Driver Licensing*, 173 A.3d 669, 678 (Pa. 2017).

Based on the evidence relied upon by the trial court, Appellee poses colorable constitutional challenges to Revised Subchapter H's registration and notification provisions based upon his asserted refutation of two critical legislative determinations: (1) that all sexual offenders pose a high risk of recidivation and (2) that the tier-based registration system of Revised Subchapter H protects the public from the alleged danger of recidivist sexual offenders.

Appellee first presents a body of research indicating that adult sexual offender recidivism rates have been improperly exaggerated, including through citations by this Court and the United States Supreme Court. As an example, he references the Courts' repeated declaration that sexual offenders have a "frightening and high" risk of recidivism, which in turn provided support for upholding various iterations of sexual offender registration systems. Appellee Brief at 17 (citing *Smith*, 538 U.S. at 103 (quoting *McKune v. Lile*, 536 U.S. 24, 34 (2002))); *see also Lee,* 935 A.2d at 882. Appellee claims that this

oft-quoted language derives not from rigorous scientific evidence but from an unsupported claim in "a 1988 National Institute of Corrections training manual, which in turn cited a 1986 Psychology Today article written for a lay audience." Appellee Brief at 17 (citing Ira Ellman and Tara Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495 (2015)). He cites substantial recent evidence undermining this claim.

Appellee additionally presents research indicating that the tier-based registration systems increase, rather than decrease, danger to the public because the reporting systems stigmatize the offender and their families and remove them from support systems. He claims that research reveals that the most effective systems for identifying recidivism are those that utilize empirically derived assessment tools based on "identified risk factors that correlate well with observed recidivism levels," in contrast to the use of tier systems based upon the underlying criminal offense, which fail to take into account individual risk factors. Appellee Brief at 57.

Nevertheless, we are unable to conclude based upon the record currently before this Court whether Appellee has sufficiently undermined the validity of the legislative findings supporting Revised Subchapter H's registration and notification provisions, especially in light of the contradictory scientific evidence cited by the Commonwealth during this appeal which may refute the Appellee's experts. It is not the role of an appellate court to determine the validity of the referenced studies based on mere citations rather than allowing the opportunity for the truths to develop through a hearing on the merits of the evidence. Accordingly, a remand is appropriate to allow the parties to

address whether a consensus has developed to call into question the relevant legislative policy decisions impacting offenders' constitutional rights. [19]

In framing the remand, we must first determine the extent to which each of the trial court's conclusions of unconstitutionality rested on its crediting of the Appellee's scientific evidence. Accordingly, we now address the court's specific determinations on each of Appellee's claims.

**B. Due Process- Irrebuttable Presumption**

We turn first to the trial court's conclusion that the registration and notification provisions of Revised Subchapter H violate Pennsylvania's due process protection through the unconstitutional utilization of an irrebuttable presumption infringing upon the right to reputation. The court highlighted that, unlike the federal constitution, the Pennsylvania Constitution specifically protects the right to reputation as a fundamental right in Article I, Section 1, which provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const., Art. I, § 1.

The trial court held the registration and notification provisions of SORNA to be facially unconstitutional, as well as unconstitutional as applied to Appellee, due to the

_____

[19] We observe that our colleagues in dissent would resolve the scientific dispute on the evidence presented by Appellee and cited by the Attorney General in briefing to this Court. Their independent analysis of the scientific evidence, however, leads to diametrically opposed conclusions. Justice Mundy would reverse the trial court concluding that Appellee failed to demonstrate that the legislative determinations are "unsupported by current scientific research in a manner that would render the statute unconstitutional," Dissenting Op. at 1 (Mundy, J., dissenting), whereas Justice Donohue would affirm the unconstitutionality of Revised Subchapter H based upon her assessment of the scientific evidence cited by the Commonwealth in its briefing to this Court. Respectfully, this divergence of opinion further solidifies the necessity of a remand to develop the factual record and allow argument regarding the scientific evidence as discussed further, *infra* at 41-44.

legislature's use of the irrebuttable presumption that all sexual offenders pose a high risk of sexual recidivism. Tr. Ct. Op. at 43 (citing 42 Pa.C.S. § 9799.11(a)(4)), 52. It recognized that the test for an unconstitutional irrebuttable presumption requires three factors: (1) the existence of a presumption that impacts "an interest protected by the due process clause;" (2) a presumption that "is not universally true;" and (3) the existence of reasonable alternatives to ascertain the presumed fact. *Id.* at 43.

Applying these factors, the court first opined that "[t]here can be no real disagreement that the label of high risk dangerous sex offender impacts one's fundamental right to reputation." *Id*. at 45. In coming to this conclusion, the court relied upon the scientific research presented during the hearing demonstrating that the label of sexual recidivist stigmatized offenders and subjected them to difficulty finding housing, employment, and education as well as erected barriers to the establishment of "pro-social relationships with others." *Id.* at 43 (citing scientific research admitted into evidence). The court opined that "[t]he public declaration, based on faulty premises . . . , that all sexual offenders are dangerous recidivists only serves to compound the isolation and ostracism experienced by this population and sorely diminish their chances of productively reintegrating into society." *Id.* at 44. The court additionally stated that the registration and notification provisions applied not only to sexual offenses but also to crimes such as unlawful restraint, 18 Pa.C.S. § 2902(b), which did not necessarily entail sexual conduct, but yet subjected the offenders to "global public shaming as incorrigible sexual recidivists." *Id.* at 44-45.

Addressing the second prong concerning whether the presumption is universally true, the court again looked to the research presented by Appellee. The court observed that the research indicated that eighty to ninety percent of all sexual offenders are never reconvicted for a sexual crime. *Id.* at 45. Moreover, the trial court opined that Appellee

fell into a subgroup of offenders without "criminal backgrounds, significant life problems, or the prognosis typical of offenders." *Id.* at 46-47. The research reviewed by the trial court revealed that this subgroup has even lower recidivism rates. *Id.* at 47.

The court acknowledged this Court's observations in *Muniz* that resolution of the conflicting evidence regarding recidivism rates was better suited for legislative determination. Nevertheless, the trial court opined,

> We have no issue with the Court's determination that policy is within the domain of the Legislature; we take no issue with the Legislature's policy that the protection of the public from dangerous sex offender recidivists is a compelling government interest. It is the Legislature's manner of implementing that policy, of branding all as evil for the actions of a most perverse few, that we reject. Thus, contrary to the Commonwealth's argument that *Muniz, supra* forecloses any further judicial inquiry regarding the constitutionality of SORNA, we would respectfully submit that neither our hands, nor those of [the Pennsylvania Supreme Court], are so tied.

*Id.* at 47. Instead, the trial court opined that, based upon the research presented, "the presumption that all sex offenders are dangerous recidivists cannot be universally true." *Id.* at 47-48.

The court turned to the third prong of the irrebuttable presumption analysis concerning whether reasonable alternatives exist to determine which offenders are at high risk of recidivating. The court again relied upon the scientific evidence presented by Appellee in support of his argument that more accurate tools than Revised Subchapter H's tier-based system existed for determining which offenders were at higher risk of recidivating and that other treatment programs reduced recidivism more that the registration and notification provisions of Revised Subchapter H.

The trial court emphasized that this Court, in *J.B.,* recently determined that SORNA's registration and notification provisions violated juvenile offenders' right to

reputation, in part, by concluding that individualized assessment, similar to that utilized by the SOAB, provided a reasonable alternative tool to determine the likelihood of recidivation. The trial court opined,

> [I]t is no great leap to conclude that the application of individualized risk assessments via a pre-deprivation hearing for adult offenders is not only possible, but is also actually available to the criminal justice system, and constitutes a reasonable, more effective alternative for identifying high-risk recidivists and reducing sexual re-offending than the draconian public shaming/warning procedures so reminiscent of colonial-age stocks and scarlet letters, currently in place for all adult sexual offenders regardless of risk under [Revised Subchapter H].

Tr. Ct. Op. at 49.

The court rejected the Commonwealth's argument that the 2018 amendments to SORNA resulted in the recidivist presumption being rebuttable because it provided a process for offenders to petition the court to be removed from the registration and notification requirements of Revised Subchapter H after twenty-five years. The court opined that "[a] post-deprivation process that provides for a hearing concerning the deprivation of a fundamental right that occurs twenty-five (25) years after the injury is akin to the provision of no process at all." *Id.* at 50. The court emphasized that during the intervening twenty-five years the adult offenders will have been "effectively placed out of the job market, ostracized from pro-social resources, and unduly stigmatized for the majority of their most productive years." *Id.*

Next, the court rejected the suggestion that the underlying trial provided an opportunity to contest the application of the registration provisions. The court observed that the trial merely provided an opportunity to contest whether the defendant committed the crime but did not provide an avenue to contest the applicability of the presumption of a high likelihood of recidivation.

Finding all prongs of the irrebuttable presumption doctrine met, the trial court concluded that SORNA's registration and notification provisions involved an unconstitutional irrebuttable presumption on its face and as applied to Appellee. *Id.* at 52. A review of the court's conclusions clearly reveals that the court's analysis of each of the three prongs of the irrebuttable presumption doctrine relies heavily upon the scientific evidence presented by Appellee. As noted, the Commonwealth parties awaited this appeal to proffer evidence to rebut Appellee's experts. Given the procedures leading to this point, the importance of the underlying issue, and our deference to legislative policy determinations, we decline to render a conclusion on the basis of the record before us. Instead, we conclude that remand is necessary to allow the parties to present additional argument and evidence to address whether a scientific consensus has developed to overturn the legislative determinations in regard to adult sexual offenders' recidivation rates and the effectiveness of a tier-based registration and notification system as they relate to the prongs of the irrebuttable presumption doctrine. *See infra* at 41-44 for additional discussion.

**C. Challenges based upon the trial court's conclusion that Revised Subchapter H's registration and notification provisions are punitive**

As indicated above, the trial court's remaining holdings finding Revised Subchapter H's registration and notification provisions unconstitutional are rooted in its determination that the provisions are punitive. According to the trial court, if the provisions are punitive, then they constitute a part of an offender's criminal sentence, which in turn is subject to the various constitutional and statutory protections alleged by Appellee. Thus, we first consider the trial court's determination that Revised Subchapter H's registration and notification provisions constitute punishment through the application of the *Mendoza-*

*Martinez* test. In so doing, we evaluate the degree to which the trial court's conclusions are based upon the scientific evidence presented by Appellee.

### 1. *Mendoza-Martinez* factors

The two-part *Mendoza-Martinez* inquiry is well established in this Commonwealth: "We first consider whether the General Assembly's 'intent was to impose punishment, and, if not, whether the statutory scheme is nonetheless so punitive either in purpose or effect as to negate the legislature's non-punitive intent.'" *Muniz*, 164 A.3d at 1208 (quoting *Williams II*, 832 A.2d at 971).

There is no dispute in regard to the first step as the General Assembly has repeatedly reenacted the unambiguous statement that the purpose of the registration and notification provisions "shall not be construed as punitive." 42 Pa.C.S. § 9799.11(b)(2). Rather, the statute expounds,

> It is the intention of the General Assembly to substantially comply with the Adam Walsh Child Protection and Safety Act of 2006 and to further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation relates to registration of sexual offenders and community notification about sexual offenders.

*Id.* § 9799.11(b)(1).

Indeed, the most recent amendments clarified that in enacting Revised Subchapter H and Subchapter I, the General Assembly intended "to address the Pennsylvania Supreme Court's decision in *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017) and the Pennsylvania Superior Court's decision in *Commonwealth v. Butler* [173 A.3d 1212 (Pa. Super. 2017)]," which both deemed the prior iteration unconstitutional based upon a finding that the statute was punitive. 42 Pa.C.S. § 9799.11(b)(4). Thus, as did the trial court, we accept that the General Assembly's intent in enacting Revised Subchapter H was non-punitive.

Accordingly, we turn to the second phase of the *Mendoza-Martinez* test, which considers the following seven factors in determining whether the effect of a statute is punitive:

(1) Whether the sanction involves an affirmative disability or restraint;

(2) Whether it has historically been regarded as a punishment;

(3) Whether it comes into play only on a finding of *scienter*;

(4) Whether its operation will promote the traditional aims of punishment - retribution and deterrence;

(5) Whether the behavior to which it applies is already a crime;

(6) Whether an alternative purpose to which it may rationally be connected is assignable for it;

(7) Whether it appears excessive in relation to the alternative purpose assigned.

*Muniz*, 164 A.3d at 1200 (quoting *Mendoza-Martinez*, 372 U.S. at 168–69) (formatted for readability). We emphasize that only the "clearest proof" of punitive effect can override the legislature's stated intent that the statute be construed as non-punitive. *Muniz,* 164 A.3d at 1208; *Lee*, 935 A.2d at 876-77.

As we have found in our recent decisions and as the parties before us agree, Factor 3, regarding a finding of *scienter*, and Factor 5, addressing whether the behavior is a crime, provide little weight to the analysis of whether sexual offender registration and notification provisions are punitive. *Muniz*, 164 A.3d at 1214, 1216. This Court in regard to Factors 3 and 5, following the United States Supreme Court, has observed that "where the concern of a sex offender registration statute like SORNA is protecting the public against recidivism, past criminal conduct is 'a necessary beginning point.'" *Id.* at 1214 (quoting *Smith*, 538 U.S. at 105). Given the agreement that these factors provide little

guidance in determining whether the statute is punitive, we will not discuss them further in this analysis.

**a. Factor 1: Whether the sanction involves an affirmative disability or restraint**

Applying the first *Mendoza-Martinez* factor, the trial court acknowledged this Court's recent analysis in *Muniz*. In *Muniz*, this Court emphasized the distinctions between the registration requirements of the then-applicable SORNA and those which this Court reviewed in *Williams II* and that the United States Supreme Court considered in *Smith*. We contrasted the absence of required in-person updates in *Smith* with SORNA, which imposed a minimum of 100 in-person updates in the first twenty-five years and likely many more due to updates for changes of address, phone numbers, appearance, and other required updates.

This Court in *Muniz* additionally rejected the Commonwealth's attempt to analogize the quarterly in-person updates to the monthly counseling sessions for SVPs, which were deemed non-punitive in *Williams II*. We distinguished the in-person updates in SORNA by emphasizing that SORNA's reporting requirements did not involve any sort of counseling to aid the offender in preventing relapse as was the case in *Williams II*. Thus, this Court's found that the registration and notification provisions of SORNA constituted an affirmative disability or restraint. *Muniz*, 164 A.3d at 1211.

The trial court in the case at bar recognized that the amendments to Revised Subchapter H were intended to address the *Muniz* decision. It observed that the recent amendments included a provision which allowed for the substitution of telephonic updates for the in-person quarterly and semiannual updates for Tier II and III offenders who complied with all registration requirements for the first three years and met other requirements. The court also acknowledged that an offender could petition to be relieved

of the registration requirements after twenty-five years. The trial court opined that the reduction in registration requirements from SORNA to Revised Subchapter H was "largely ephemeral" as the offender remains "for all intents and purposes, on probation for the entirety of their lives, with all the regulation, control, and sundering of privacy that such status entails." Tr. Ct. Op. at 61.[20] It additionally opined that the provision for review after twenty-five years was "illusory and akin to no post-deprivation process at all." Appellee Brief at 62. It, therefore, concluded that this factor weighed in favor of finding Revised Subchapter H's requirements punitive.

We acknowledge that the court's analysis of this factor does not overtly rely upon Appellee's scientific evidence. Nevertheless, the trial court's recounting of the impact of the registration updates and the publication of the relevant data are to some extent informed by the expert's evidence of the negative effects of registration on sexual offenders, as discussed in more detail in regard to other factors below. Accordingly, in balancing all of the factors, the court may have weighed this factor more heavily as punitive because of the court's acceptance of Appellee's expert evidence. Therefore, we find it appropriate for the trial court to reevaluate this factor after a full hearing on the scientific evidence.

### b. Factor 2: Whether it has historically been regarded as a punishment

---

[20] The trial court expressively emphasized the imposition on the offender:

> They cannot change their address without reporting it to the police. They cannot begin school or switch schools without notifying the police. They cannot buy a new car without informing the police. Nor can they take a new job without reporting it to the police, so that this fact, along with the rest of the personal aspects of their lives, can be further disseminated to anyone in the world via the Internet.

Tr. Ct. Op. at 61.

In *Muniz*, this Court opined that the registration and notification provisions of SORNA were comparable to the established punitive measures of probation and shaming. We again distinguished the United States Supreme Court's 2003 analysis of registration provisions in *Smith*, observing that the "technological environment" had changed in the years between 2003 and 2017 such that the shaming aspect of the registration provisions differed dramatically. *Muniz*, 164 A.3d at 1212. While *Smith* had distinguished colonial era shaming from Alaska's 2003 online registry by emphasizing that shaming depended on face-to-face ostracism by the community, this Court recognized that the current technology and social media usage created a world in which "[y]esterday's face-to-face shaming punishment can now be accomplished online." *Id.* (quoting *Commonwealth v. Perez*, 97 A.3d 747, 765-66 (Pa. Super. 2014)).

We additionally opined that the in-person reporting requirements of SORNA, as distinguished from the statute reviewed in *Smith*, resembled the periodic meetings imposed upon those on probation and similarly included the threat of incarceration for failure to abide by the reporting requirements. This Court concluded that these attributes of SORNA weighted this factor toward finding the statute punitive. *Id.* at 1213.

The trial court in the case at bar concluded that "nothing about the [Revised Subchapter H] amendments to SORNA alters" this Court's analysis in *Muniz.* Tr. Ct. Op. at 65. It opined that Revised Subchapter H's "slightly ameliorated in-person appearances do not change the global nature of the public shaming or the intensity of the probationary-style onus on the offender." *Id.* It, therefore, found this factor also weighed in favor of viewing Revised Subchapter H as punitive in nature.

We recognize that, similar to Factor 1, the trial court's analysis of this factor does not specifically draw upon the scientific evidence presented by Appellee. Instead, it is reliant upon the analysis in *Muniz*. Nevertheless, we recognize that the expert evidence

addressing the effects of the registry on offenders may have altered the trial court's assessment of the degree to which the online public registry is akin to public shaming and probation. As with the first factor, we conclude that consideration of the scientific evidence presented on remand may alter the trial court's weighting of this factor.

### c. Factor 4: Whether its operation will promote the traditional aims of punishment - retribution and deterrence

In *Muniz*, we distinguished SORNA's provisions from the Megan's Law II provisions addressed in *Williams II*. While the criminal offenses involved in Megan's Law II were generally serious crimes where the deterrent effect of registration paled in comparison to the substantial incarceration terms, we emphasized that SORNA's registration provisions applied to a much wider range of offenses, many of which carried minimal terms of incarceration.[21] We concluded that the registration and notification provisions, therefore, entailed a more significant deterrent effect in SORNA than in past iterations.

---

[21] Specifically, we pointed to following predicate offenses that could be graded as misdemeanors:

> interference with custody of children, 18 Pa.C.S. § 2904; luring a child into a motor vehicle or structure, 18 Pa.C.S. § 2910; indecent assault, 18 Pa.C.S. § 3126(a)(1) - (6), (8); invasion of privacy, 18 Pa.C.S. § 7507.1(b); and obscene and other sexual materials and performances, 18 Pa.C.S. § 5903(a)(3)(ii), (4)(ii), (5)(ii), (6). SORNA predicate offenses that may have a maximum incarceration term of two years or less under federal law are as follows: video voyeurism, 18 U.S.C. § 1801; misleading domain names on the internet, 18 U.S.C. § 2252B; and abusive sexual conduct, 18 U.S.C. § 2244.

*Muniz,* 164 A.3d at 1215 n.20.

We also concluded in *Muniz* that the retributive aspects of the registration provisions were greater than in the sexual offender registration provisions reviewed in *Smith* or *Williams II*, observing that "SORNA has increased the length of registration, contains mandatory in-person reporting requirements, and allows for more private information to be displayed online." *Muniz*, 164 A.3d at 1216. Given the increased deterrent and retributive aspects of SORNA as compared with prior statutes, we concluded that this factor weighed more heavily in favor of finding the provisions to be punitive. *Id.*

In the case at bar, the trial court concluded that the analysis of this factor in *Muniz* controlled as "[t]he Act 10 amendments to SORNA did nothing to alter the deterrent and retributive effects of the pre-amendment Act." Tr. Ct. Op. at 68. It emphasized that Revised Subchapter H "still requires lengthy, often lifetime, registration, still requires in-person registration, places onerous reporting burdens on offenders, and allows very private information to be published worldwide over the Internet." *Id.* at 68-69. The trial court supported this analysis by additionally questioning the legitimacy of the Commonwealth's asserted goal of protecting the public from sexual offender recidivation. In addressing this factor, the court explicitly referenced the scientific evidence presented by Appellee indicating that sexual offender registries are ineffective. *Id.* at 67.

While this factor could arguably be addressed solely by comparing the provisions of the current Revised Subchapter H to those of SORNA analyzed in *Muniz*, the trial court's analysis demonstrates its consideration of the effectiveness of sexual offender registries in addressing this factor. As with the other factors, we conclude that the court's analysis of this factor also favors remanding for further consideration in light of any additional scientific evidence.

**d. Factor 6: Whether an alternative purpose to which it may rationally be connected is assignable for it**

The appellant in *Muniz* conceded that the sixth *Mendoza-Martinez* factor weighed in favor of finding SORNA non-punitive when he agreed that there was a rational connection between the sexual offender registration and notification provisions and public safety. This Court, nevertheless, addressed this issue based upon the claims raised by an *amicus curiae* in the case, contesting the rationality of the connection. The amicus cited scientific evidence that "most offenders will not commit another sexual offense," that "SORNA therefore produces an illusion of security from stranger perpetrators when the majority of sexual crimes are committed by someone known to the victim[;]" and that "SORNA diverts law enforcement efforts away from the most serious offenders and from effective methods of crime control and treatment." *Muniz*, 164 A.3d at 1216. The Commonwealth's *amicus curiae*, in turn, cited contrary scientific evidence allegedly supporting the legislative presumption that sexual offenders pose a high likelihood of recidivation.

In response to these arguments of *amici* in *Muniz*, this Court, understandably, concluded that the evidence was not sufficient to overturn the legislative finding that "[s]exual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." *Id.* at 1217 (quoting 42 Pa.C.S. § 9799.11(a)(4)). We additionally observed that "the General Assembly legislated in response to a federal mandate based on the expressed purpose of protection from sex offenders." *Id.*

As has been repeatedly quoted by the Commonwealth parties in this case, we additionally opined:

> We recognize there are studies which find the majority of sexual offenders will not re-offend, and that sex offender

registration laws are ineffective in preventing re-offense; we also recognize there are studies that reach contrary conclusions. In this context, we find persuasive [the] argument that policy regarding such complex societal issues, especially when there are studies with contrary conclusions, is ordinarily a matter for the General Assembly. *See e.g., Commonwealth v. Hale*, [128 A.3d 781, 785 (Pa. 2015)] (where "substantial policy considerations" are involved "such matters are generally reserved . . . to the General Assembly").

*Id.* at 1217. We continued reasoning that "[a]lthough there are contrary scientific studies, we note there is by no means a consensus, and as such, we defer to the General Assembly's findings on this issue." *Id.* Accordingly, we concluded that "there is a purpose other than punishment to which the statute may be rationally connected and this factor weighs in favor of finding SORNA to be nonpunitive." *Id.*

In regard to the sixth factor, the trial court acknowledged this Court's analysis in relation to SORNA. The trial court, however, respectfully concluded that "the evidence presented in court on July 9, 2018, gives rise to serious concerns about the rationality of [Revised Subchapter H's] connection to its alleged non-punitive purpose." *Tr. Ct. Op.* at 70. The court instead concluded that the connection between the registration requirements and the intended purpose of public protection was "anything but rational." *Id.* It, therefore, weighed this factor in favor of finding the statute punitive. Nevertheless, acknowledging that this Court could conclude otherwise based on *Muniz*, it opined that it would still find Revised Subchapter H's requirements punitive even if the sixth factor was weighted as non-punitive.

Even though the trial court expressly limited the impact of this factor on its eventual balancing of the seven factors, it cannot be disputed that the trial court's evaluation of the Appellee's experts' evidence affected its view of the case. Indeed, it expressly references its evaluation of this factor in its consideration of Factor 7. Thus, the trial court's analysis of this factor also counsels in favor of a remand to develop the record.

**e. Factor 7: Whether it appears excessive in relation to the alternative purpose assigned.**

This Court in *Muniz* recognized that it had expressed hesitation concerning this factor in *Williams II* regarding the absence of any procedure by which, in that case, an SVP could later assert that he or she no longer posed a danger to the public. Notably, however, the SVP determination process in *Williams II* entailed an initial individualized assessment of risk of danger. In contrast, we recognized in *Muniz* that "SORNA categorizes a broad range of individuals as sex offenders subject to its provisions, including those convicted of offenses that do not specifically relate to a sexual act." *Muniz* 164 A.3d at 1218. We, therefore, concluded that "SORNA's requirements are excessive and over-inclusive in relation to the statute's alternative assigned purpose of protecting the public from sexual offenders." *Id.*

The trial court recited our analysis in *Muniz* and opined that Revised Subchapter H "has no impact on the concerns raised by [this Court] with respect to this factor." Tr. Ct. Op. at 71. Referencing back to its conclusions regarding Factor 6, the court continued that this Court's conclusion regarding the excessiveness factor in *Muniz* "is even more compelling when the rationality of SORNA's relationship to its professed non-punitive purpose is deconstructed and debunked." *Id.* at 71. Thus, the trial court's evaluation of this factor is also tied to the strength of Appellee's scientific evidence, which may require reevaluation following the presentation of any additional scientific evidence on remand.

**f. Balancing of Factors**

Weighing the factors in *Muniz,* this Court concluded that all of the relevant factors, other than Factor 6, weighed "in favor of finding SORNA to be punitive in effect despite its expressed civil remedial purpose." *Muniz*, 164 A.3d at 1218. Specifically, we held that "SORNA involves affirmative disabilities or restraints, its sanctions have been historically

regarded as punishment, its operation promotes the traditional aims of punishment, including deterrence and retribution, and its registration requirements are excessive in relation to its stated nonpunitive purpose." *Id.*

Likewise, weighing all the factors, the trial court in the case at bar opined that the balancing applied in *Muniz* was applicable to Revised Subchapter H such that it "is still sufficiently punitive in effect to overcome the General Assembly's stated non-punitive purpose." Tr. Ct. Op. at 72. The court additionally reasserted, that while not determinative of its balancing of factors, it would nevertheless weigh Factor 6 more heavily in favor of finding Revised Subchapter H punitive because it did "not consider SORNA to be rationally connected to any legitimate non-punitive purpose because of the evidence presented before [it] on July 9, 2018." *Id.*

We observe that the scientific evidence presented by Appellee during the post-sentence motion arguably influenced the trial court's consideration of all five relevant factors and overtly drove the analysis of three. Accordingly, we conclude that its labeling of Revised Subchapter H as punitive was impacted by its assessment of Appellee's expert evidence such that reevaluation of the balancing of the seven *Mendoza-Martinez* factors is appropriate following presentation of additional scientific evidence on remand.

The trial court's conclusion that Revised Subchapter H is punitive inevitably resulted in the court's determination that the registration requirements were part of Appellee's criminal sentence, and thus, subject to the various constitutional and statutory protections. Evaluating each challenge raised by Appellee, the trial court concluded that (1) Revised Subchapter H violated the dictates of *Apprendi* and *Alleyne* because it subjected offenders to increased registration provisions without a jury determining that the offender posed a risk of future dangerousness beyond a reasonable doubt; (2) the registration periods constituted illegal sentences in excess of the statutory maximum

terms of incarceration; (3) the provisions resulted in an excessive sentence in violation of the federal and state constitutional provisions related to cruel and unusual punishments; and (4) Revised Subchapter H violated the separation of powers doctrine by "encroach[ing] upon the judiciary's fact-finding and individualized sentencing responsibilities." Tr. Ct. Op. at 78. As these holding flow from the trial court's determination that Revised Subchapter H is punitive, they too should be reevaluated following remand.

### V. Conclusion

It is abundantly clear that the trial court's various declarations of Revised Subchapter H's registration and notification provisions as unconstitutional derived directly from the court's acceptance of and reliance upon Appellee's experts' evidence challenging the legislative determinations underpinning Revised Subchapter H, specifically (1) that all sexual offenders pose a high risk of recidivation and (2) that the tier-based registration system of Revised Subchapter H protects the public from the alleged danger of recidivist sexual offenders.

Unfortunately, the procedural posture of this case prevents tidy resolution of the matter by this Court. While Appellee presented a colorable argument that the General Assembly's factual presumptions have been undermined by recent scientific studies, we are unable to affirm the trial court's several conclusions finding Revised Subchapter H unconstitutional. We note that the evidence of record does not demonstrate a consensus of scientific evidence as was present to find a presumption not universally true in *J.B.*, 107 A.3d 17-19, nor the "clearest proof" needed to overturn the General Assembly's statements that the provisions are not punitive, which we have noted "requires more than merely showing disagreement among relevant authorities," *Lee*, 935 A.2d at 885. We hesitate to find these standards met by the stipulated admission of three experts'

affidavits, without an opportunity to weigh this evidence against contrary evidence, if any exists.[22]

---

[22] The Dissent in favor of affirmance frames this remand as "forgiv[ing]" the Commonwealth and providing it an "excuse" by imposing "a heavy burden" on Appellee challenging the constitutionality of Revised Subchapter H. Dissenting Op. at 2 (Donohue, J., dissenting). Respectfully, it is not an excuse but our constitutional duty to impose that burden in order to uphold the separation of powers between this Court and the General Assembly. Indeed, as detailed above, we defer policy making determinations to the legislative branch absent a challenger's demonstration that those determinations result in a statute that clearly, palpably and plainly violates the constitutional rights of citizens. *Shoul*, 173 A.3d at 678. For the reasons set forth above, we conclude that the current record does not meet that burden and accordingly remand for further determinations.

Rather than remanding, the Dissent in favor of affirmance independently examines the scientific evidence cited by the Commonwealth and determines that it supports the conclusion that prior precedents have been mistaken regarding the high rates of recidivism relied upon to support sexual offender laws. Dissenting Op. at 2 (Donohue, J., dissenting). As support, the Dissent correctly quotes the study referenced by the Commonwealth as acknowledging "a substantial gulf between the sexual recidivism rates observed in the empirical studies and the rates supposed by the laity and endorsed by the [United States] Supreme Court." *Id.* at 16 (quoting Scurich at 4).

The authors of the study, however, do not concede the validity of that gap in terms of actual recidivism as opposed to the recidivism observed in some studies. Instead, without endorsing a specific reoffense rate or taking a "position on the propriety of sexual offender legislation[,]" they nevertheless "question challenges to that legislation to the extent [the challenges] are based on current empirical assertions that sexual offender recidivism is 'low.'" Scurich at 4. The paper then sets forth various factors of the empirical studies, such as those relied upon by Appellee, that underestimate the recidivism rate of sexual offenders.

We generally agree with the Dissent's analysis that "the relevant question should not be whether convicted sexual offenders are committing unreported sexual crimes, but rather whether sexual offenders commit more sexual crimes than other groups not subject to similar registration laws." Dissenting Op. at 18 (Donohue, J., dissenting). We respectfully disagree, however, with the Dissent's conclusion that the legislature's finding that sexual offenders pose a higher risk of recidivation has "been debunked," *id,* to such a degree as to justify overturning the legislature's policy determination that "[s]exual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." 42 Pa.C.S. § 9799.11(a)(4).

However, reversal is likewise inappropriate because it was the Commonwealth's tactics at the post-sentence hearing that potentially prevented the necessary development of the record. As noted, the Commonwealth forwarded an argument that the trial court did not have authority to overturn the legislative policy determinations based upon the proffered scientific evidence, an argument we refuted in *J.B.* and continue to reject today. As stated above, the courts of this Commonwealth have the inherent authority as a co-equal branch to strike legislative acts if they violate the rights protected by our Constitutions. *J.B.*, 107 A.3d at 14 (citing *Nixon v. Com. Dept. of Pub. Welfare*, 839 A.2d 277, 286 (Pa. 2003)).

We recognize that the Commonwealth parties relied upon our recent statement in *Muniz*, 164 A.3d at 1217, rejecting similar expert evidence calling into question the legislature's assessment of sexual offender recidivism risks and the effectiveness of tier-based registration systems. In light of this reliance, we emphasize that all cases are evaluated on the record created in the individual case. Thus, a court need not ignore new scientific evidence merely because a litigant in a prior case provided less convincing evidence. Indeed, this Court will not turn a blind eye to the development of scientific research, especially where such evidence would demonstrate infringement of constitutional rights.

Nevertheless, we also emphasize that it will be the rare situation where a court would reevaluate a legislative policy determination, which can only be justified in a case

---

Instead, we deem it prudent to remand for further hearing to allow the parties to proffer evidence and argument regarding whether Appellee's scientific evidence sufficiently undermines the fact-finding foundation of the legislative policy determinations. As discussed above, we emphasize that the present case is distinguishable from *J.B.,* where the research presented by the juvenile defendants was corroborated by a growing body of caselaw which emphasized the rehabilitative aspects of juveniles and the distinctions between adult and juvenile offenders generally, *see supra* at 14-15.

involving the infringement of constitutional rights and a consensus of scientific evidence undermining the legislative determination. We reiterate that while courts are empowered to enforce constitutional rights, they should remain mindful that "the wisdom of a public policy is one for the legislature, and the General Assembly's enactments are entitled to a strong presumption of constitutionality rebuttable only by a demonstration that they clearly, plainly, and palpably violate constitutional requirements." *Shoul*, 173 A.3d at 678.

As is apparent from the trial court findings, the evidence presented by Appellee provides a colorable argument to debunk the settled view of sexual offender recidivation rates and the effectiveness of tier-based sexual offender registration systems underlying the General Assembly's findings as well as various decisions of this Court and the United States Supreme Court. Nevertheless, as the trial court did not have the benefit of the opposing science, if any, the evidence currently in the record does not provide a sufficient basis to overturn the legislative determination. Accordingly, we conclude that the proper remedy is to remand to the trial court to provide both parties an opportunity to develop arguments and present additional evidence and to allow the trial court to weigh that evidence in determining whether Appellee has refuted the relevant legislative findings supporting the challenged registration and notification provisions of Revised Subchapter H.

Accordingly, we vacate that portion of the trial court's order declaring the registration requirements of Revised Subchapter H of SORNA unconstitutional and remand for further proceedings in accordance with this opinion.

Justices Todd, Dougherty and Wecht join the opinion.

Justice Donohue files a dissenting opinion.

Justice Mundy files a dissenting opinion in which Chief Justice Saylor joins.